GOLDBERG & ASSOCIATES
JULIE A. GOLDBERG (SBN 235565)
14370 Ventura Blvd
Sherman Oaks, California 91423
Telephone: (818) 999-1559
Email: ecf@goldbergimmigration.com
*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLARE ELAINE WARREN, J.F., a minor and R.F., a minor, by and through their Guardian Ad Litem, ALAN MARK HARARI, | Case No.: **'25CV1866 W    KSC** |
| | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| *Plaintiffs*, | 1. Wrongful Detention |
| v. | 2. Violation of Civil Rights; |
| | 3. Judicial Deception; |
| COUNTY OF SAN DIEGO; SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY; POLINSKY CHILDREN'S CENTER; RADY CHILDREN'S HOSPITAL; ALEJANDRA GUTIERREZ; LISA GARDNER; ASHLEY GUTIERREZ; CHRISTINE MORSE; M.D. SHALON NIENOW and DOES 1-50 Inclusive; | 4. Monell Related Claims; |
| | 5. Violation of State Civil Rights (CC §43); |
| | 6. Violation of State Civil Rights (CC § 52.1) |
| | 7. Fabrication of Evidence |
| *Defendants*. | |

COME NOW Plaintiffs, Clare Elaine Warren, and J.F. and R.F., minors by and

through their Guardian Ad Litem, Mark Harari, through undersigned counsel, and

allege as follows:

# **PRELIMINARY STATEMENT**

1. Plaintiffs bring this action to redress egregious and ongoing violations of their rights under the Fourth and Fourteenth Amendments of the United States Constitution by Defendants acting under color of law and pursuant to official policy and practice. Specifically, Defendants seized and detained minor Plaintiffs J.F. and R.F. without probable cause, without a warrant, and absent any exigent circumstances as required by California Welfare and Institutions Code § 300. Defendants further subjected the minor Plaintiffs to invasive medical examinations, including forced drug and blood testing, without the knowledge or consent of their mother, the sole legal custodian, and in direct contravention of state law and established constitutional standards. The children were then subjected to further trauma, injuries, and psychological harm at the Polinsky Children's Center, and were unreasonably denied reunification with their mother despite exculpatory evidence of her fitness.

2. Plaintiff Clare Elaine Warren and her minor children have survived a history of extreme domestic violence and sustained efforts to escape ongoing threats and abuse perpetrated by the putative father and his associates. Despite obtaining and maintaining criminal restraining orders since 2022, Plaintiff Warren and her children have been exposed by Defendants' actions to renewed risk, retaliation, and trauma, as Defendants ignored or willfully disregarded the protective orders in place, further imperiling Plaintiffs' safety.

3. As set forth in detail herein, Defendants, as a matter of policy, practice, and custom, knowingly and repeatedly violated Plaintiffs' civil rights—conduct that is not only unlawful, but expressly forbidden by both federal and California law. Despite clear warnings and multiple prior lawsuits challenging identical misconduct at the Polinsky Children's Center, Defendants have continued to disregard legal requirements and the constitutional rights of children and parents alike.

4. By way of illustration and without limitation, Defendants' agency conduct violations include:

**a.** Seizing and detaining minor Plaintiffs without probable cause, judicial authorization, or exigent circumstances, in violation of the Fourth Amendment and California Welfare and Institutions Code §§ 305–306;

**b.** Subjecting minor Plaintiffs to non-consensual, invasive medical examinations, drug testing, and procedures absent medical necessity, a court order, or parental consent, in violation of the Fourth and Fourteenth Amendments and state law (*see Wallis v. Spencer*, 202 F.3d 1126; *Mann v. County of San Diego*, 907 F.3d 1154);

**c.** Fabricating, altering, and withholding material evidence—including medical and drug test results, and official reports—with the intent and effect of misleading the Juvenile Court, in violation of Plaintiffs' due process rights (see *Hardwick v. County of Orange*, 844 F.3d 1112);

**d.** Intentionally omitting exculpatory evidence, including negative drug test results and evidence of Plaintiff Warren's fitness and compliance, from official reports and court filings;

**e.** Permitting, and in some instances facilitating, the violation of criminal restraining orders protecting Plaintiffs from the putative father, including by allowing unauthorized contact and providing confidential information to prohibited parties;

**f.** Denying Plaintiff Warren regular and meaningful visitation and communication with her children, while affording preferential access and influence to the putative father and his family, contrary to court orders and the best interests of the children;

**g.** Coercing, intimidating, and retaliating against Plaintiffs for seeking legal redress, including the filing of habeas petitions and complaints, by escalating restrictions, denying services, and increasing adverse actions;

**h.** Failing to provide adequate notice, due process, and transparency in the investigation and adjudication of alleged child welfare concerns, including failing to comply with statutory requirements for notice, hearings, and record-keeping;

**i.** Subjecting minor Plaintiffs to unsafe, unsanitary, and psychologically harmful conditions at the Polinsky Children's Center, resulting in documented injuries, illnesses, and emotional distress;

**j.** Failing to provide full, timely, and accurate records to Plaintiffs and their counsel, thereby impairing Plaintiffs' ability to challenge wrongful conduct and seek redress;

**k.** Retaliating against Plaintiffs by fabricating new allegations and withholding reunification, following Plaintiffs' lawful exercise of their rights to petition and due process.

5.      The conduct of the Defendants collectively, is consistent with an established and unconstitutional policy and practice of the San Diego County Health and Human Services Department, and knew or should have known that these violations have frequently been occurring at the Polinsky Children's Center which has repeatedly ignored statutory and judicial directives, failed to implement corrective measures notwithstanding multiple lawsuits and adverse findings, and has taken no action to correct course or adjust policy, addressing the same misconduct, and allowing the further and unabated trauma and increased risk to both Plaintiff Mother and minor children Plaintiffs with reckless disregard for the same, while also imposing their own traumatic conduct on both mother and children, inconsistent with the purpose and mission of the State, the County, and through the Health and Human Services Agency.

6.      As a direct and proximate result of Defendants' unlawful actions, Plaintiffs have suffered and continue to suffer family separation, severe psychological and emotional trauma, deprivation of constitutional and statutory rights, and irreparable

harm to the familial bond. Defendants' acts have violated Plaintiff Clare Elaine Warren's First Amendment right to petition for redress, her Fifth and Fourteenth Amendment rights to due process and familial association, and the Fourth and Fourteenth Amendment rights of minor Plaintiffs J.F. and R.F.

7.    Defendants' actions have harmed and continue to harm Plaintiffs as their unlawful actions have caused significant trauma to minors J.F. and R.F., in violating their Fourth and Fourteenth Amendment rights. The children are frequently hysterical when they get to see their mother, sobbing and begging to come home.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to the following provisions: 28 U.S.C. § 1331 (questions of federal law) and 42 U.S.C. 1983 as to violations of Plaintiffs' rights under the U.S. Constitution and laws, including those under the First, Fourth, and Fourteenth Amendments. Additionally, supplemental jurisdiction for Plaintiffs' state claims is asserted pursuant to 28 U.S.C. 1367(a).

9.    There are no administrative remedies available to Plaintiffs to redress their grievances described in this Complaint. This action challenges the inconsistent application of the Child Status Protection Act and policy against the clear language of the statute, and Defendants' procedural policies, practices, and interpretations of law. Therefore, the jurisdictional limitations under 8 U.S.C. § 1252 do not apply.

10.     Venue is proper in the Southern District of California under 28 U.S.C. § 1391 on the following grounds: 2) acts or omissions giving rise to this petition occurred in this judicial district (28 U.S.C. § 1391(e)(2)).

11.     Personal jurisdiction exists over all Defendants because they reside in California, conduct substantial business in California, or their acts and omissions complained of occurred in this District.

12.     Exhaustion of state judicial or state administrative remedies is not a prerequisite to bringing an action under section 1983. Patsy v. Bd. of Regents of State of Fla., 457 U.S. 496, 500 (1982) ("[W]e have on numerous occasions rejected the argument that a § 1983 action should be dismissed where the plaintiff has not exhausted state administrative remedies.").

## **PARTIES**

13.     Plaintiff Clare Elaine Warren (hereinafter "Plaintiff Warren") is the biological mother of minor Plaintiffs J.F. and R.F. and the parent having sole physical and legal custody over the minor Plaintiffs at all times. Plaintiff Warren resides in Los Angeles County, California.

14.     Plaintiff J.F. (hereinafter "Plaintiff J.F.") is a minor child, and the son of Plaintiff Warren. Plaintiff J.F.'s usual place of residence is in Los Angeles County, California.

15.     Plaintiff R.F. (hereinafter "Plaintiff R.F.") is a minor child and the daughter of Plaintiff Warren. Plaintiff R.F.'s usual place of residence is in Los Angeles County, California.

16.     MARK HARARI has made an application to be appointed Guardian ad Litem for the minors, J.F. and R.F. in this action, usual place of residence is in Los Angeles County, California. He is the partner of Plaintiff Warren.

17.     Defendant COUNTY OF SAN DIEGO (hereinafter "COUNTY"), at all times mentioned herein, was and is a public entity.

18.     Defendant SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY (hereinafter "H.H.S.A.") at all times mentioned herein, was and is a subdivision or entity of the COUNTY.

19.     Defendant POLINSKY CHILDREN'S CENTER (hereinafter "POLINSKY"), at all times mentioned herein, was and is a subdivision or entity of the COUNTY.

20.     Defendant ALEJANDRA GUTIERREZ (hereinafter "Defendant Alejandra"), at all times mentioned herein, was an officer, agent, and employee of H.H.S.A.

21.     Defendant LISA GARDNER (hereinafter "Defendant Gardner"), at all times mentioned herein, was an officer, agent, and employee of H.H.S.A.

22.     Defendant ASHLEY GUTIERREZ (hereinafter "Defendant Gutierrez"), at all times mentioned herein, was an officer, agent, and employee of H.H.S.A. Defendant Gutierrez is sued in her official and individual capacity.

23.    Defendant CHRISTINA MORSE (hereinafter "Defendant Morse"), at all times mentioned herein, was an officer, agency, and employee of H.H.S.A. Defendant Morse is sued in her official and individual capacity.

24.    Defendant M.D. SHALON NIENOW (hereinafter "Defendant Nienow"), at all times mentioned herein, was a physician contracted to conduct forensic examinations of children at various locations, including, but not limited to, Rady Children's Hospital, the Chadwick Center for Children and Families, and the COUNTY's Polinsky Children's Center.

25.    Defendant Rady Children's Hospital (hereinafter "Defendant RADY"), was and is a medical center, located in the County of San Diego. At all times mentioned herein, RADY worked in collaboration with and on behalf of and for the benefit of the COUNTY and its agents.

26.    Plaintiffs are ignorant of the true names and capacities of those Defendants sued herein as Does 1 through 50, Inclusive, and therefore sue them by such fictitious names. Plaintiffs will amend the Complaint to show the true names and capacities of said DOE Defendants when the same are ascertained.

27.    Plaintiffs are informed and believe, and based upon such information and belief, allege that each of the Defendants are responsible in some manner for the events and happenings referred to herein and was the legal cause of injury and damages to Plaintiffs as herein alleged.

28.     Plaintiffs are informed and believe and, based upon such information and belief, allege that, at all times herein mentioned, each and every Defendant was the agent and/or employee of their co-defendants, and each of them, acting at all relevant times herein under color of the authority of a governmental entity under the statutes, ordinances, regulations, customs and usage of the State of California and/or the United States Constitution and related laws.

## STATEMENT OF RELEVANT FACTS

*Family Background*

29.     Plaintiff Clare Elaine Warren ("Plaintiff Warren") is and at all relevant times was a resident of Los Angeles County, California, where she resides with her minor children, J.F. and R.F. Until recently, Plaintiff Warren and her children experienced repeated displacement due to domestic violence perpetrated by the putative father, Joseph Franco ("Franco"), and threats from his associates..

30.     In 2022, the putative father, Franco, threatened Plaintiff Warren and the children by holding a rifle to her head in their home, leading Plaintiff Warren and her children to flee for their safety. Following this incident and continued stalking and threats by Franco—including repeated appearances outside the residence—Plaintiff Warren's mother was compelled to sell the home for the family's protection.

31.     Subsequent to leaving their home, Plaintiff Warren and her children resided in a series of domestic violence shelters and hotels provided through California's HUD

program, until Plaintiff Warren secured a permanent residence in Los Angeles County. Throughout this period, Plaintiff Warren took all lawful steps to protect herself and her children, including seeking assistance from law enforcement and domestic violence advocates.

32.    Plaintiff Warren has no criminal record and has consistently maintained a law-abiding and healthy lifestyle. She is an honorably discharged veteran of the United States Coast Guard, where she received extensive training in gun safety and security procedures. Following her military service, Plaintiff Warren was employed as a private security specialist and bodyguard for high-profile clients and families.

33.    The putative father, Franco, originally being a member of the Coast Guard, once released, began a documented history of substance abuse, gang involvement, animal cruelty, and acts of severe domestic violence against Plaintiff Warren and the children. He repeatedly threatened Plaintiff Warren and the children at gunpoint and inflicted physical injuries upon Plaintiff Warren in the presence of the minor Plaintiffs.

34.    Notwithstanding Franco's subsequent incarceration for domestic violence offenses, Plaintiff Warren and the children remained targets of harassment and retaliation from Franco's family and associates, including stalking, vandalism of their vehicle (keying), and ongoing threats, necessitating continued protective measures and contributing to Plaintiffs' instability and trauma.

*No Basis for Initial Detention of Children Under Cal. Welf. and Inst. Code 300 et seq.*

35.    After a period of displacement and instability caused by domestic violence and threats from the putative father and his family, Plaintiff Warren, with the support of California's HUD program, secured stable housing in Los Angeles County for herself and her minor children. This residence was chosen specifically to protect the children from continued exposure to danger, and to provide a safe and supportive environment in which to heal from past trauma.

36.    Plaintiff Warren has engaged in a lifestyle for herself and for her children which seeks to reduce exposure to toxins and unnatural products and ingredients in diet, as well as in other facts of daily life, including immunizations. Plaintiff J.F. and R.F. eat organic meals and snacks, and engage in numerous physical activities with their mother, including doing yoga together, or participating in regular play at the park. Additionally, Plaintiff Warren has a stringent homeschool program, which is designed specifically to protect her children from bullying and types of conduct, routinely found in public schools. All of which the children are now exposed to on an extreme level at the Polinsky Children's Center.

37.    Plaintiff Warren has similarly decided and undertaken to homeschool her children in a program designed to meet the educational milestones required by the State of California while also guiding her children in the way she feels is best for their growth. This education includes hands-on learning outdoors, outdoor science projects, including at the beach, various outdoor parks, and places where they can

engage with and learn about animals, plants, and conduct various science experiments in an age appropriate manner.

38.    Despite Plaintiff Warren's diligent efforts to provide a safe and stable home, she continued to receive credible threats from the putative father following his release from prison, including text messages referencing drug use, gang activity, stalking, and explicit threats of violence against Plaintiff Warren and anyone with whom she associated.

39.    The danger to Plaintiff Warren and her children was so severe that, prior to the events of May 30, 2025, the San Diego County domestic violence advocacy team was actively assisting Plaintiff Warren in exploring options for immediate relocation out of the State of California, further underscoring the lack of any lawful basis to suspect Plaintiff Warren of abuse or neglect under California Welfare and Institutions Code § 300.

***Events Leading to the Unlawful Initial Seizure and Detention***

40.    A mutual friend of Plaintiff Warren and the putative father, concerned for Plaintiff Warren's safety due to ongoing threats, provided her with a firearm and advised her to register it in her own name. Plaintiff Warren secured the gun in a locked safe stored in the rear compartment of her SUV, behind the third row of seats, at all times inaccessible to her children while they were in the car.

41.    On May 30, 2025, Plaintiff Warren traveled with her minor children, J.F. and R.F., from Los Angeles County to San Diego County to attend a high-risk meeting

with the District Attorney's Office. The purpose of this meeting was to discuss protective services and available assistance in light of the putative father's recent release from prison and his renewed threats against Plaintiff Warren and her children.

42.    After the meeting, Plaintiff Warren took her children to the beach to continue their homeschool science education. The children discovered an octopus and, as part of their educational project, Plaintiff Warren assisted them in obtaining a tank and other necessary supplies to study the animal further.

43.    Later that day, Plaintiff Warren proceeded with her children to her storage unit. Due to multiple previous break-ins by the putative father and recent threats, she intended to move the storage unit to a new one where it would be safer and gather some items for her home in Los Angeles. She bought 36 boxes and began to clean out and dispose of items that were unnecessary. She put the items in her car while she worked, so it could be dumped easily while they were leaving.

44.    Contemporaneous photographs and video evidence show that, upon arrival at the storage unit at approximately 5:02 p.m. on May 30, 2025, J.F. and R.F. were happy, healthy, uninjured, and under the direct supervision of their mother.

45.    The storage office hours are until 8p.m. and unit holders are allowed to be in the unit until 10 p.m. and others have a 24-hour pass. The hours people are in the storage are not enforced. Plaintiff Warren had notified management of the past break-ins and ongoing safety concerns. She provided photographic documentation of prior

forced entries and explained her urgent need to move the contents of her unit for her family's protection.

46.     That evening, security personnel at the storage facility observed a suspicious individual with a laptop on the hood of a car after 10:00 p.m. and called the police to investigate. The individual was completely unknown to Plaintiff Warren except she had seen him at the storage facility before but bore no relation to her or her children.

47.     During their response, police officers located Plaintiff Warren and her children at their unit, which was apart from her vehicle and the suspect individual. Although Clare had taken the gun out of the safe inside the car for protection, Plaintiff Warren and her children were not near the car, which was parked and locked separately.

48.     Without consent, police officers took Plaintiff Warren's keys from the storage unit and proceeded to her locked vehicle, where they conducted a warrantless search. In the vehicle, they located ammunition and broken pipe fragments; however, there were no controlled substances or evidence of endangerment, and the items were inaccessible to the children.

49.     The officers detained Plaintiff Warren and her children in a patrol car and questioned Plaintiff Warren about the presence of a firearm. Plaintiff Warren disclosed, truthfully and voluntarily, that there was a firearm behind the third row of seats in her SUV. Officers retrieved the firearm from the location as described.

50.     While at the storage facility, police attempted to contact Plaintiff Warren's partner to take custody of the children. Due to the late hour, he was sleeping and did

not answer his phone. Unfortunately, Plaintiff Warren's other relatives consist only of her mother and father—her mother suffers from early onset Alzheimer's disease, and her father resides in a senior living facility.

51.    Police informed Plaintiff Warren that, due to the lack of an available responsible adult, her children would be taken to Polinsky Children's Center while she was processed, booked, and released at the police station and assured her that she could retrieve them the second she was released.

52.    At the time, the children were well-accounted for. They were in good health with no injuries, well fed, and in their mother's supervision and care at all times. The police report notes that while they were investigating and calling around for a few hours to get someone to take the children, the children fell asleep in their mother's arms.

53.    Plaintiff Warren was booked, released and charged with possession of a handgun registered to another, and released. She was released without any findings of child endangerment or neglect.

54.    The police report of the incident expressly indicates that there "no evidence of neglect" of the children, and that multiple efforts were made to find someone to leave the children with instead of Defendant POLINSKY.

55.    The children were thereafter taken to the hospital and subjected to medical examinations without the knowledge and consent of Plaintiff Warren. Despite the

unwarranted nature of the examinations, the children were cleared for discharge **home**. Despite this, they were brought to the Polinsky Children's Center.

56.     Upon her release, Plaintiff Warren immediately proceeded to the Polinsky Children's Center, where she was initially told she would be able to collect her children.

57.     When Plaintiff Warren arrived at the Polinsky Children's Center around noon on May 31, 2025, she was refused access to her children without any explanation or written notice.

58.     At no time did Defendant Polinsky articulate or provide any legal basis under Cal. Welf. & Inst. Code § 300 for the continued detention of J.F. and R.F. There were no findings of abuse, neglect, or immediate danger, and the children's welfare had been affirmatively established by both law enforcement and medical personnel.

59.     The events that followed have amounted to breathtakingly egregious violations of U.S. and California Constitutional rights of Plaintiff Warren and the minor children Plaintiffs, despite the clear history of judicial notice that the continued conduct of the Defendants was constitutionally impermissible.

***Unlawful Detention of Minor Children Plaintiffs***

60.     When the San Diego Police Department took minor children Plaintiffs J.F. and R.F. to Defendant POLINSKY, the children were, as a matter of Defendant POLINSKY's standard operating policy and practice, transported to Rady Children's

Hospital in San Diego, California for involuntary medical examinations, without parental consent

61.     These medical examinations were done without regard to the requirements of Cal. Welf. & Inst. Code 305, and 309 both of which require that, absent immediate danger or risk of serious physical harm, children must be immediately released to their parent or legal guardian without unnecessary delay.

62.     Plaintiff Warren was not notified that her children would be, or were being, subjected to any medical examinations. She was given no opportunity to consent, consult, or even be present, in direct contravention of both California law and her fundamental rights as a parent.

63.     The medical examinations of minor children Plaintiffs R.F. and J.F., completed and discharged on May 31, 2025 at 9:09am and 9:24am respectively. These examinations included urine drug screening, which confirmed that both children were negative for all controlled substances. The Rady Children's Hospital discharge orders for each minor Plaintiff stated unequivocally that both children were **"safe for discharge home at this time."**

64.     Despite these medical findings, which demonstrated no signs of neglect or abuse, and the and despite the contemporaneous police report expressly stating that there was "no evidence of neglect"or drug use, and documenting multiple attempts to find a suitable caretaker before resorting to placement at POLINSKY, Defendant

POLINSKY, as a matter of policy and custom, refused to release the children to Plaintiff Warren.

65.    Additionally, Defendant ALEJANDRA informed Plaintiff Warren that "nothing would be done" regarding the children's release until Monday, June 2, 2025, when a social worker would be available. Defendant ALEJANDRA represented that it was the express policy of Defendant POLINSKY not to release any child until a social worker had completed a "safety evaluation," even when all medical and law enforcement evidence supported immediate reunification.

66.    Plaintiff Warren remained at Defendant POLINSKY's facility from noon on May 31, 2025, until approximately 6:00 a.m. the following day, having been denied all meaningful access to her children, and only left after repeated urging and by her partner was she convinced to to get some rest.

67.    Plaintiff Warren asked numerous times repeatedly and expressly  to be able to see, speak with meet with, any contact whatsoever with her children These requests were denied by Defendant ALEJANDRA, Defendant GARDNER, Defendant MORSE, and additional Individual DOE Defendants, who at all relevant times prevented and refused any contact between Plaintiff Warren minor children Plaintiffs J.F. and R.F.

68.    In her distress and confusion, Plaintiff Warren contacted the undersigned Counsel, who immediately contacted law enforcement on Plaintiff's behalf to intervene and request that the children be released to their mother. Counsel cancelled

a scheduled international flight to Egypt, remaining in the country to provide urgent assistance due to the escalating circumstances.

69.    Law enforcement did not arrive at Polinsky Children's Center until 4am. By that time, Plaintiff Warren had been at the Polinsky Children's Center since noon, and had been rejected access to her children multiple times. In the time it took for the police to arrive, Counsel and Plaintiff Warren's partner, Mark Harari, also arrived and were also denied access.

70.    Upon arrival at Defendant POLINSKY, the first responding police officer entered the facility and attempted to secure the release of the children to Plaintiff Warren, but was categorically refused. The supervising police officer subsequently consulted with the department's legal team, reviewed the incident report, and expressly stated to Plaintiff Warren and Counsel that, based on his reading of the police report, there was no evidence of neglect and he could not understand why the children were being detained. The supervisor re-entered Defendant POLINSKY to advocate again for the children's release, but was denied a second time. Ultimately, the supervisor returned and advised Plaintiff Warren and Counsel that despite his efforts, law enforcement lacked jurisdiction over Defendant POLINSKY, and he reiterated his confusion and concern, stating again that there was no neglect and no apparent lawful basis for the continued detention of the children.

71.     On Monday, June 2, 2025, Plaintiff Warren and Counsel returned to Defendant POLINSKY before 7:00 a.m. seeking reunification, but were again denied entry and access.

72.     Although Defendant POLINSKY, and the Individual Defendants, refused to allow Plaintiff Warren any access to her children,  the putative father, Joseph Franco, arrived at Defendant POLINSKY at 8:00 a.m. accompanied by his mother, and declared declared that he was there to take the children.

73.     Plaintiff Warren remains unaware of how the putative father learned of the children's whereabouts or the circumstances leading to their detention at POLINSKY. On information and belief, Plaintiff Warren alleges that Defendants, or their agents, unlawfully communicated or disclosed information to the putative father or his family, in violation of standing restraining orders.

74.     At all times, a valid and effective Criminal Restraining Order was in place prohibiting any contact or disclosure to the putative father, about Plaintiff Warren's whereabouts.

75.     When Plaintiff Warren attempted to notify Defendant MORSE and staff at Defendant POLINSKY of the existence of the Criminal Restraining Order, Defendant MORSE explicitly refused to review or even acknowledge the Order

76.     Defendant POLINSKY's staff further represented that they had not contacted the putative father; however, when the putative father arrived, Defendant MORSE

greeted him and his family with familiarity and permitted them access to the children, in stark contrast to the repeated denial of access to Plaintiff Warren.

77.    On the same day, Plaintiff Warren and Counsel met with Defendant GUTIERREZ, providing her with certified copies of all criminal restraining orders, documentary evidence of extreme domestic violence, and certified conviction records of the putative father.

78.    Plaintiff Warren further provided Defendant GUTIERREZ with records showing that the children were properly enrolled in two accredited homeschooling programs, evidence that any firearm present was locked in a safe, proof that the children were never left unattended, and volunteered to submit to drug testing—all to demonstrate her parental fitness and dispel any suspicion of neglect or unfitness.

79.    Despite this overwhelming and exculpatory evidence, Defendant GUTIERREZ continued to refuse to return the children to Plaintiff Warren or allow her to pick them up,

80.    When asked if she had visited the children, Clare explained she had not been allowed. The social worker reacted with surprise and said, "You haven't been there to see the kids? The center told us dad's been here all weekend, but you were never there."

81.    Petitioner Warren had been at the center from noon Saturday, May 31, 2025 until 6am June 1, 2025. She spent all day calling on Sunday, and was back at the

facility on June 2, 2025 at 7am. Defendant GUTIERREZ was provided all of the call logs, recordings and text messages as evidence.

82.    Defendant GUTIERREZ was also provided with photos of the children conducting their science lessons, receipts showing the healthy food that was regularly purchased for the children, advised that the children were not permitted to eat sweets and junk food, and again provided with school records showing they were obtaining appropriate education.

83.    Regardless, Defendant GUTIERREZ proceeded prepared a Detention Hearing report on June 4, 2025, which was not served on Plaintiff Warren until she appeared for the Detention Hearing.

84.    Plaintiff Warren was denied meaningful, timely access to any hearing transcript or recording, despite multiple requests and the requirements under California Rule of Court 5.532(a) and Fourth Appellate District local rules, which require such recordings in dependency proceedings.

85.    The Juvenile Court continued the Detention Hearing twice by one day each time and so the government could obtain additional evidence to detain the children with her Partner Mark, leading Plaintiffs to believe that once Plaintiff Warren's partner cleared he was going to have the children released to him while dependency proceedings continued.

86.     Despite a clear background check, compliance with all requests, and a clear relationship with the children, and the request of the children to go with Mark Harari, and consent of Minors counsel the government refused to agree.

87.     On the advice of appointed Counsel, assurances of a special hearing Plaintiff Warren agreed to allow the continuance of the detention hearing to allow further background checks of Mark Harari.

88.     The written minutes of the Juvenile Court's hearing failed to reflect the court's oral rulings regarding visitation frequency, the right of Mark Harari to supervise visits on campus at POLINSKY, or other essential matters, thereby denying Plaintiff Warren an adequate record for appeal or review.

89.     Plaintiff Warren also learned at the hearing that the hearings are not recorded, and that the policy of the Juvenile Court was not to prepare recordings or transcripts of hearings, despite local court rules in the Fourth Appellate District of the Court of Appeals where the Juvenile Court sits, requiring recordings and transcripts from the Detention Hearing onward in dependency cases for appeal purposes, and California Rule of Court 5.532(a) similarly requires recordings for transcripts in cases heard by a judge.

90.     The written minutes of the hearing does not reflect the oral decisions the Juvenile Court judge made regarding Plaintiff Warren's visitation as to frequency, the amount of time, and as to the fact that Mark Harari could supervise on campus at POLINSKY.

91.    Despite assurances of a special hearing, when Plaintiff Warren returned on June 16, 2025, and compliance by Mark Harari with all background and home safety requirements,d had made all requested modifications (including installation of locks and a bunk bed for the children, Detectors), the Defendants, at the eleventh hour, refused to release the children to him, citing a purportedly positive drug test despite his having nothing to do with the test, and without providing the initial negative, exculpatory drug test.

92.    On information and belief, the Defendants fabricated or otherwise manipulated this purported drug test, acting in concert with the putative father's family, who maintain connections to Defendant POLINSKY staff through the paternal grandmother's association with Allied Universal Security and gang affiliations with the Raskol's gang and Imperial 13.

93.    Defendants represented to the Juvenile Court that there was a positive drug test but did not produce or authenticate the test for the court's review, and the court failed to require any such production.

94.    Plaintiff Warren filed a Petition for Habeas to ask the Juvenile Court to release the children as they were not properly detained under the law at Cal. Welf. & Inst. Code 300 and 305.

95.    Although the Petition for Habeas was ultimately denied, upon information and belief, the Defendants, and each of them, changed the course of their treatment and escalated their campaign of retaliation and deprivation of rights in direct response to

Plaintiff's assertion of her legal remedies.of the petition to act with malice and intent to deprive Plaintiff Warren of her legal rights to her children in retaliation for filing the action against them.

### *Misrepresentations, Fabrications, and Omissions from Reports Intended to Influence and Deceive the Juvenile Court*

96.     After closely reviewing the Detention Report and the later Dependency Report prepared by Defendant GUTIERREZ and Case Notes by Defendant MORSE, against the evidence which Plaintiff Warren has managed to obtain, it is apparent that these reports intentionally omit, distort, and mischaracterize critical facts and exculpatory evidence is being withheld  front the reports for the purpose of misleading the Juvenile Court regarding the true circumstances of this case and the reality of the situation between all parties.

97.     At some point during their purported investigation into the dependency status of minor children Plaintiffs J.F. and R.F., Defendants GUTIERREZ and MORSE entered contemporaneous notes into the statewide CWS/CMS (Child Welfare Services/Case Management System) database—an official state record routinely relied upon by other social workers, administrative officials, and, where applicable, the Juvenile Court itself.

98.     The CWS/CMS system is a state wide database owned, operated, and maintained by the State of California. All California counties have access to it and are required to enter their child welfare services data into it. There is a particular function

available in the CWS/CMS system called "Contact Notes." It is also sometimes

referred to as the "Delivered Services Log."

99.    All county HHSA workers, like Defendant GUTIERREZ and Defendant

MORSE, and the other Individual Defendants for that matter, are trained that the

Contact Notes/Delivered Service Logs are to be completed at or near the time of the

events recorded. They are also trained that the information recorded there is required

to be truthful, honest, accurate and complete. The reason for this requirement is that

the Contact Notes are an official record of the State of California; other HHSA

workers who perform other functions in the case will read and rely on the Contact

Notes/Delivered Service Logs in making important case decisions; and, on occasion,

the material in the Contact Notes/Delivered Service Logs may even be relied upon by

the judge assigned to the juvenile dependency case, if a dependency case is filed. For

example, workers who become involved in the case later are reasonably likely to rely

on the Contact Notes/Delivered Service Logs in fashioning their reports to the

Juvenile Court.

100.    On information and belief, when Defendants GUTIERREZ and MORSE, along

with DOES 1-50 entered their "notes" into the Contact Notes/Delivered Service Logs,

they knowingly inserted materially false information and omitted exculpatory

evidence in their Contact Notes/Delivered Service Logs and subsequently replicated

these distortions in the Detention Report and other filings, thereby creating a

fundamentally misleading official record. This false, inaccurate and incomplete

information was subsequently copied and pasted and engrossed upon in the Detention Report as well as other later reports filed in the case.

101.   The fabricated narrative authored by Defendants GUTIERREZ and MORSE along with other Individual Defendants DOES 1-50, and each of them, created a false narrative replete with false statements, fabricated facts, and incomplete and/or misleading information is replete with specific instances of intentional misrepresentation, fabrication, and omission, including but not limited to:

a.   **Criminal Restraining Order:** The Detention Report on June 4, 2025, intentionally omits material facts about Plaintiff Warren's Criminal Restraining Order—specifically, it fails to disclose that the District Attorney admitted a procedural error in not including the children as protected parties and expressly instructed Plaintiff Warren to immediately seek a temporary civil restraining order because it would take a while to get it in front of the criminal judge to correct, in order to make it appear the TRO was obtained for the purposes of obstructing the putative father;

b.   **Police Reports:** The report misrepresents Plaintiff Warren's arrest by falsely claiming she was arrested for methamphetamine possession; alleges she lied about the location of the firearm when it when the police report actually state it was exactly where Plaintiff  Warren claimed it to be; falsely asserts the firearm was loaded when the Police specifically stated there wasn't a bullet in the chamber; omits photographic evidence of the safe in the back of the SUV; fabricates charges of possession of drugs

or paraphernalia; and invents allegations that Plaintiff Warren arrived at the storage facility accompanied by men to the storage facility despite video evidence otherwise;

c.    **Drug Testing and Chain of Custody:** The Detention Report grossly misrepresents the drug testing conducted on the minor children Plaintiffs and omits critical details concerning the handling, results, and integrity of those tests. Specifically, the Report fails to state that urine samples collected from the children on May 31, 2025, were promptly tested and found to be negative for all controlled substances. It further fails to disclose that a purported "confirmatory" urine test was not even assigned a work order until June 3, 2025—three days after the samples were originally collected. The samples were further compromised as they were labeled as being from a "Source Not Given," assigned a completely different sample number than the originals, and bore an alleged collection time which was after the children had already been medically discharged, making the stated timing impossible. The confirmatory test was not performed until eleven days after the alleged collection date, in direct contravention of standard chain-of-custody protocols which require testing within 72 hours to ensure reliability. These serious departures from accepted procedures not only undermine the validity of the results but also strongly indicate a failure to maintain proper chain of custody, thereby casting significant doubt on the integrity and admissibility of any drug testing results presented by Defendants to the Juvenile Court.

d.      **Medical Evidence:** The Detention Report and subsequent filings misrepresent and fabricate medical findings related to the minor children Plaintiffs. Specifically, the reports falsely claim that a Dr. De La Rosa examined the children and found them to be malnourished. In reality, the medical records demonstrate unequivocally that the children never saw Dr. De La Rosa, nor were they ever diagnosed with malnourishment. To the contrary, the contemporaneous medical records from Rady Children's Hospital state that both children were healthy and explicitly found to be "safe for discharge home" following their examinations on May 31, 2025. Further, a subsequent medical evaluation performed at Polinsky Children's Center by Dr. Gorham confirmed that both J.F. and R.F. were "extremely healthy." The deliberate misrepresentation of medical evidence, coupled with the omission of exculpatory findings by actual treating physicians, demonstrates a clear intent to deceive the Juvenile Court and to manufacture a narrative of neglect or harm that is wholly unsupported by the record.

e.      **Injuries at Polinsky:** The reports omit documentation of injuries suffered by the children while in Defendant POLINSKY's custody—including photographs of bruising and spider bites—as well as evidence of unsanitary conditions, incidents of bullying, and inadequate supervision, all corroborated by photographic and testimonial evidence and omits the reports from minor children Plaintiffs J.F. and R.F. of their specific fears of being alone around certain DOE staff members, Punitive Father and Paternal Uncle.

f.      **Evidence of Mother's Fitness:** The Detention reports systematically exclude evidence of Plaintiff Warren's fitness as a parent, and subsequent reports omit all exculpatory evidence with relation to Plaintiff Warren, including evidence of the children's involvement with two separate homeschooling programs consistent with California's educational guidelines for such programs, biweekly outdoor science lessons, yoga and outdoor sports activities with the children; the organic and healthy, unprocessed food diet that Plaintiff Warren prepares and feeds her children consistent with California health guidelines; vacations, social events and bonding activities with Plaintiff Warren and her partner with the minor children; failed to acknowledge compliance with all of the requests for Mark Harari to prepare the children to stay at his home during dependency proceedings, including purchase of a bunk bed for the children, installation of a carbon monoxide monitor, and purchase of a requested additional lock for a closet; and failed to acknowledge or note any and all videos, photos and other evidence provided by the mother.

g.      **Evidence Concerning Putative Father and Relatives:** The reports omit or downplay substantial inculpatory evidence concerning the putative father and his relatives, including—but not limited to—multiple criminal convictions for domestic violence, the existence of numerous restraining orders, documented ongoing drug use, and verifiable gang affiliations not only as to the putative father, but also as to uncles and the paternal aunt. Despite this, the reports consistently allow the putative father's family to make defamatory statements about Plaintiff Warren, endorsing such

allegations without evidence, rebuttal, or challenge. There is a complete failure to include or discuss all criminal restraining orders that were in place as to the putative father over the last 3 years; it allows putative father to claim that he is a victim of domestic violence, and allows him to deny he committed domestic violence despite being *convicted* of domestic violence in court; The reports misrepresent or sanitize the putative father's criminal history by failing to confront the contradictory evidence and recommending placement of the children with a paternal uncle who has never met the children before and where one has never showed up to POLINSKY to visit the children and who advocate for the mother to never see the children and go to jail; and has never asked the putative father to hair follicle test, and despite evidence provided by Plaintiff Warren that putative father had been doing drugs since he got out of prison.

h.    **Children's Expressed Wishes:** The reports ignore and omit the repeated and documented pleas, crying, and begging by J.F. and R.F. to return home to their mother, their expressed distress in the presence of the putative father's family, and their statements of discomfort and fear regarding certain POLINSKY staff and the putative father's relatives. and do not want to see the putative father;

i.    **Coercion of Children's Statements:** The reports fail to acknowledge that Defendants, particularly GUTIERREZ, repeatedly interrogated the children until they obtained answers fitting the agency's narrative, including fabricating or attributing written and artistic "evidence" to the children that was inconsistent with their actual

developmental abilities; purports to include pictures that were drawn by the children which did not match the other styles of writing and drawing by a 6 year old child in the file, including a picture "drawn by R.F." of the "pipe" in Plaintiff Warren's car; omitting that Defendant GUTIERREZ told R.F. it was not safe to go back to her mom; omitting that Defendant GUTIERREZ repeatedly tells J.F. and R.F. that their mother takes drugs;

j.    **Denial of Access and Reporting of Injuries:**The Detention Report and subsequent reports do not reflect that POLINSKY and the Individual Defendants have told Plaintiff Warren is not getting disclosures or incident reports about injuries to the children, until the children report the injury to Plaintiff Warren or she notices the injury on visitations; Omits that staff tell Plaintiff Warren a different story about how injuries occur to the children from what the children tell Plaintiff Warren; Omits that the Defendants do not Plaintiff Warren daily visits with her children, but putative father's mother received multiple visits in a row; omits that Individual Defendants stand near the children during calls with the mother and cut them off from being able to tell Plaintiff Warren anything that would implicate Defendants for abuse or neglect of the minor children Plaintiffs.

k.    The Detention Report misrepresents the causes of injuries to the children during the course of their stay at Polinsky Children's Center, which have been excessive and unnecessary, including lying about the cause of a bruise received by J.F.; lying about the children being permitted to sleep in the same room when a staff

member purposefully separates J.F. from R.F.; omitting the failure of the Polinsky staff to prevent bullying which causes more injuries to J.F.; omitting the unsanitary conditions at Polinsky and failure to keep bugs out of the facility, which has resulted in spider bites to R.F.; failure to supervise the children leading to two head injuries to R.F.; and omitting from the report the refusal to allow the children to speak to their attorney when they request to do so.

l.      **Drug Testing Procedures:** The Detention Report misrepresents the discussions surrounding the hair follicle testing. Specifically, Defendant GUTIERREZ told Plaintiff Warren that there is no effect on her hair follicle test from dying hair and extensions, when Plaintiff Warren had been told by the facility that they could not do the test because hair dye and extensions would invalidate the results; Plaintiff Warren grew out underarm hair for a month to be able to do the follicle testing **which body hair testing showed negative for all substance going back three months and up a one year . Additionally,** Drug when the tests are intentionally scheduled in San Diego while Defendant Ashley Gutierrez knows that Plaintiff Warren lives in Los Angeles and cannot get there sooner than three hours, and then refused to accept the voluntary immediate drug test Plaintiff Warren gets in Los Angeles

m.      **m. Medical Appointment Misconduct and False Reporting:**

Despite being repeatedly instructed by Plaintiff Warren not to conduct medical or dental appointments for the children in her absence, Defendant Gutierrez attended a

dental appointment for J.F nad R.F.., arriving at the dentist's office approximately thirty minutes early, fully aware that Plaintiff Warren was en route. Plaintiff Warren had informed Gutierrez by text that she was five minutes away at 8:37am and would arrive soon. Nonetheless, Gutierrez began the appointment early. When Plaintiff Warren arrived at the dentist's office—fifteen minutes before the scheduled appointment time, as documented—J.F.'s appointment was already nearly complete.

n.      Defendant Gutierrez then deliberately falsified the report regarding the timing of Plaintiff Warren's arrival, the substance of her conversation with the dentist, and the treatment that was actually needed. She further misrepresented to the record that Plaintiff Warren told her she could not be present in the treatment room, when in fact, Plaintiff Warren was visibly upset that Gutierrez failed to wait for her arrival and failed to inform the dentist that Plaintiff Warren would be attending. These actions not only violated Plaintiff Warren's parental rights and instructions but also resulted in the creation of a materially false record to the prejudice of Plaintiff Warren.

o.      **Retaliatory Report Corrections:** When confronted with contradictory evidence, Defendant Gutierrez  responded by issuing purportedly "corrected" reports, by doubling down on the previous misrepresentation, fails to include the contradictory evidence which does not meaningfully address or rectify their prior misrepresentations but instead perpetuated a false and misleading record to the Juvenile Court.

102.   By creating a false record of their investigation, which they knew others would rely on later, Defendant GUTIERREZ and Defendant MORSE, and the Individual Defendants, and each of them, set in motion a series of events that would, predictably, be used by others to construct a narrative which, on its face, was unreasonably and unjustifiably prejudicial to Plaintiff Warren, while ignoring all of the inculpatory evidence against the putative father and his relatives, including extensive criminal records. As a result, as discussed above and as continues to the present, minor children Plaintiffs J.F. and R.F. continue to be detained away from their parent having sole legal and physical custody, Plaintiff Warren, for an inordinate, unreasonable, and unjustified period of time after the unlawful and unwarranted seizure of the minor children Plaintiffs - in spite of the fact that there was no true, just, or lawful basis to do so.

103.   The Individual Defendants, and each of them, knew or should have known, that the information being entered into the CWS/CMS system was false, misleading, or omitted exculpatory evidence, and that such information would be presented to the Juvenile Court despite its falsity.

104.   Defendant GUTIERREZ and Defendant MORSE, and the Individual Defendants, and each of them, knew or should have known, that the information being entered into the Detention Report and all subsequent reports was false, misleading, excluded exculpatory evidence as to Plaintiff Warren, and excluded

inculpatory evidence as to the putative father and his relatives, and that such information would be presented to the Juvenile Court despite its falsity.

### *Medical Records and Issues with Drug Testing in the Initial Detention*

105.   An additional and seriously consequential misrepresentation, and what appears to be, and upon information and belief is, a falsified record comes from Defendant NIENOW which has been referenced and relied upon by the Juvenile Court

106.   Defendants attached two medical reports for minor children Plaintiffs R.F. and J.F. which purported to have been completed on May 31, 2025, but also listed work order dates within the reports as June 3, 2025 and testing from June 10, 2025, respectively.

107.   The notes of the individual reports were both identical, referring to both children. Specifically, Defendant NIENOW states that "Photographic documentation of this child's physical examination findings were reviewed."

108.   Further, Defendant NIENOW ordered an expanded drug test on both children, notwithstanding the negative initial urine drug tests.

109.   The notes from Defendant NIENOW in the medical record purport to be from a May 31, 2025 consultation, and purport to be discussing review of expanded drug testing conducted on June 10, 2025.

110.   Specifically, Defendant NIENOW states that as of the May 31, 2025 consultation as to minor child Plaintiff J.F., "expanded drug testing has returned

positive for methamphetamine and it[s] metabolite. This is definitive evidence of exposure to methamphetamine and is diagnostic of neglect."

111.   The work order for these expanded drug testing samples attached to Defendant NIENOW's report was submitted to the testing laboratory on June 3, 2025 not May 31, 2025. The samples themselves were labeled as collected from a "SOURCE NOT GIVEN," and they have TWO DIFFERENT SAMPLE CONTROL NUMBERS despite allegedly being from the same sample.

112.   The work order states that the samples were taken on May 31, 2025, from a "SOURCE NOT GIVEN." There is no indication of a chain of custody of the urine sample between May 31, 2025 and June 3, 2025 when the work order was submitted to NMS Labs.

113.   In the May 31, 2025, Defendant NIENOW makes it appear as though they have met with and evaluated the children themselves, but in fact only reviewed photographs. The report also makes it appear that the expanded drug testing occurred on May 31, 2025 but it did not occur until at least June 3, 2025 with no return on them until June 10, 2025. On May 31, 2025, all drug tests were negative.

114.   The samples for the blood tests did not have matching collection numbers between the test record and the hospital record at time of collection. The new collection time is from a time after the children had already been discharged. The samples were several days old by the time they were sent to the receiving lab on June

3, 2025, with no chain of custody provided. The samples themselves were listed as "Source Not Given."

115.    Defendant NIENOW did not examine J.F. and R.F., and did not speak to Plaintiff Warren regarding the children. Moreover, Defendant NIENOW did not request any drug testing to be done of Plaintiff Warren, nor did they review the voluntary testing that Plaintiff Warren had undertaken. Based on a drug test processed days after the sample was taken, with no clear source of the urine sample and no chain of custody information, Defendant NIENOW concluded that the situation was "diagnostic of neglect."

116.    Defendant NIENOW concluded her report by stating: "If [J.F.] and his sister were to be returned to the environment in which they were exposed to drugs and *in which their mother is suffering from active substance use disorder, it would place them at extreme risk of ongoing drug endangerment, neglect, or other maltreatment.*"

117.    Defendants GUTIERREZ, MORSE, and the other Individual Defendants, and each of them, relied on the medical report from Defendant NIENOW to find Plaintiff Warren had exposed minor children Plaintiffs J.F. and R.F. to drugs, despite Plaintiff Warren having repeated negative drug tests, no drugs being found anywhere at the scene where the police encountered Plaintiff Warren or in her car.

118.    Defendants GUTIERREZ, MORSE, and the other Individual Defendants, and each of them, presented the information in the report from Defendant NIENOW to the Juvenile Court, without showing the exculpatory evidence, including Plaintiff

Warren's negative drug tests, and negative hair follicle test that showed 3 months up to one year of no drug usage.

119.   Upon information and belief, Defendants Gutierrez, Morse, and the other Individual Defendants, and each of them, knowingly attempted to prevent Plaintiff Warren from receiving exculpatory evidence, including the negative drug test of J.F.

120.   The urine drug testing of the children was done without immediate medical emergency, without a court issued warrant, and without the knowledge or consent of Plaintiff Warren, the sole parent having legal and physical custody over minor children Plaintiffs J.F. and R.F.

***Violation of Constitutional and Civil Rights of Plaintiffs***

121.   At all relevant times, Defendants and each of them were aware—by direct notification, court orders, and documentation—that Plaintiff Clare Warren possessed sole legal and physical custody of minor Plaintiffs J.F. and R.F., as confirmed by orders following the father's arrest for domestic violence and intent to cause great bodily harm, and by evidence of the mother's continued exemplary care (see, e.g., court orders, protective orders, and custody documentation in evidence).

122.   Notwithstanding this knowledge, the Individual Defendants, including but not limited to Defendants Gutierrez, Morse, Alejandra, Gardner, Nienow, and DOES 1–50,  and each of them, intentionally, knowingly, and with reckless disregard for Plaintiffs' rights, undertook a pattern of conduct in direct violation of the Plaintiffs'

rights under the First, Fourth, and Fourteenth Amendments to the United States

Constitution, as well as their statutory and parental rights under California law. Such

conduct included, but was not limited to, the following:

a.    **Willful Interference with Court-Ordered Custody and Visitation:**

Defendants refused to honor the court's order granting Plaintiff Warren visitation and

failed to facilitate or permit regular, meaningful contact between Plaintiff Warren and

her children, instead granting unsupervised access and excursions to the paternal

uncle, who was on probation for DUI, in direct contravention of the mother's

custodial rights. This included permitting the uncle to remove the children from

POLINSKY without supervision, expose them to inappropriate environments, such as

an adult male "that never were a shirt" feeding the children fast food contrary to their

prescribed diet, and subjecting them to religious practices against the express wishes

and belief system of Plaintiff Warren.

b.    **Manufactured Barriers to Parental Drug Testing:** Defendants scheduled,

last-minute drug tests for Plaintiff Warren in San Diego, knowing she resided in Los

Angeles  once after she had just met with social workers in the Los Angeles Area,

and with insufficient time to travel the required three hours. Repeatedly refused

scheduled testing in Los Angeles . When Plaintiff Warren promptly completed

alternative tests in Los Angeles—results that were negative and documented—

Defendants refused to accept them and falsely reported her as non-compliant, as

evidenced by text messages, laboratory receipts

c.      **Disregard for Children's and Dietary Needs:** Defendants authorized and facilitated the provision of excessive sugar, sweets, and fast food to the minor children, directly disregarding Plaintiff Warren's documented medical and dietary directives, and thereby undermining the children's established healthy, whole-food diet and in violation of her legal authority as sole custodial parent.

d.      **Disregard for Children's Medical  Needs:** Defendants further scheduled and conducted medical, dental, and psychological evaluations—including blood draws, and dental procedures—without the informed consent or prior knowledge of Plaintiff Warren, and in violation of her legal authority as sole custodial parent. In addition, Defendants' purposefully and knowingly failing to have the children follow their standard dental protocol as followed at home;

e.      **Failure to Document and Report Injuries:** Defendants willfully withheld incident reports, injury reports, and surveillance video relating to injuries suffered by J.F. and R.F. while in the custody of POLINSKY, including documented instances of unexplained bruising, head injuries, and untreated bug bites. Plaintiff Warren was routinely denied access to information regarding the nature and cause of her children's injuries, learning of such only through the children themselves or upon observation during limited visitation.

f.      **Exposure to Age-Inappropriate and Unapproved Activities:** Defendants took minor children Plaintiffs J.F. and R.F. to PG-rated movies not appropriate for their age group without parental consent, exposing them to content inappropriate

content their ages and inconsistent with Plaintiff Warren's express wishes, in further disregard of her parental rights.

g.      **Obstruction of Educational Rights:** Defendants refused to permit Plaintiff Warren to continue or supervise the homeschooling curriculum and educational programs previously established and approved for J.F. and R.F., despite repeated requests and the absence of any court order prohibiting such educational contact.

h.      **Malicious Alienation and Emotional Harm:** Defendants, and each of them, repeatedly made statements to the minor children suggesting that their mother was unsafe or unfit, and that it would be unsafe for them to reside with her, despite their knowledge of Plaintiff Warren's custodial rights, her lack of any criminal record,  her exemplary care as a mother and the extensive and violent criminal history of the putative father and his relatives. These repeated statements resulted in unnecessary emotional distress, confusion, and trauma to the minor children.

### FIRST CAUSE OF ACTION
### VIOLATION OF FOURTH AMENDMENT - UNLAWFUL SEIZURE
### UNDER 42 U.S.C. §§ 1983
### (Against All Individual Defendants)

123.   Plaintiffs hereby adopt and incorporate by reference paragraphs 1 through 122, as if fully set forth herein.

124.   On or about May 31, 2025, Defendants DOES 1-50, acting under color of state law as wardens, social workers, agents, and employees of the Polinsky Children's Center and the San Diego County Health and Human Services Agency, knowingly,

intentionally, and in concert, seized and detained minor Plaintiffs J.F. and R.F. without a warrant, without a court order, and without reasonable or probable cause to believe the children were in imminent danger or immediate need of medical care, as required by the Fourth Amendment to the United States Constitution and California Welfare & Institutions Code §§ 305 and 306 with deliberate indifference to the rights of the Plaintiffs.

125.    The Fourth Amendment prohibits unreasonable searches and seizures and, in the context of child welfare, strictly bars the removal or continued detention of children from parental custody in the absence of a court order or imminent risk of serious physical harm which, at a minimum, requires officials detaining minor children in their custody to have probable cause that the minor child is in immediate danger of physical or sexual abuse.  See *Mabe v. San Bernardino County, Dept. of Public Social Services*, 237 F.3d 1101, 1107–08 (9th Cir. 2001); *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000).

126.    The Polinsky Children's Center, and its wardens, officials, and employees seized and detained minor Plaintiffs J.F. and R.F without probable cause, without a warrant and without a court order. The records and police report makes clear that the police were not dropping the children off as children in need of protection; that Plaintiff Warren would be released shortly, and that the children were not in any immediate danger of harm or need of medical care. The hospital discharge records, and contemporaneous evidence—including video, photographs, and medical

records—demonstrate that J.F. and R.F. were healthy, uninjured, in the care of their mother at all times, and specifically cleared by medical professionals as "safe for discharge home." (See Rady Children's Hospital Reports, Photographs, and Video Evidence.)

127.   The Fourth Amendment does not allow wardens and officials to ignore information that negates probable cause and does not absolve them of their responsibility to reasonably follow the information provided to them.

128.   In seizing and detaining the minor Plaintiffs J.F. and R.F., Does 1-50, inclusive and each of them, were acting under color of state law.

129.   The Defendants' policy of detaining and/or removing children without exigent circumstances (imminent danger of serious bodily harm) caused its violation of the minor Plaintiffs' Fourth Amendment rights.

130.   As a result of the Defendants' unlawful seizure and detention, the minor Plaintiffs J.F. and R.F. have suffered and continue to suffer severe emotional harm, as well as physical and mental harm.

131.   As a direct result of these Individual Defendants' violations, and in accordance with 42 U.S.C. § 1983, Plaintiffs civil rights have been violated in that they have suffered, and will continue to suffer damages, including but not limited to, physical, emotional and mental anxiety and anguish; as well as to incur attorney fees, costs and expended in the underlying case and in this matter, as authorized by 4 U.S.C. § 1988

in an amount not yet ascertained, all of which will be shown according to proof at trial.

132.    Said Individual Defendants' wrongful conduct as alleged herein was intentional, done with malice, and with conscious disregard of the truth and for the rights of the Plaintiffs herein, and as a result of their despicable conduct, Plaintiffs are therefore entitled to recover punitive damages from said individual Defendants' wrongful acts for the purposes of punishing said Defendants and to deter others from such conduct in the future.

**SECOND CAUSE OF ACTION
VIOLATION OF CIVIL RIGHTS
UNDER 42 U.S.C. §§ 1983
(Against All Individual Defendants)**

133.    Plaintiffs adopt and incorporate as if set forth at length herein, paragraphs 1 through 132.

134.    Commencing on or about May 31, 2025 and continuing through the date of filing this action, All Individual Defendants, and Does 1 through 50, Inclusive, and each of them, as alleged herein, were acting under color of state law when they knew and agreed, and thereby conspired, to unlawfully detain, seize, question, threaten, examine, coerce, and/or initiate and pursue an investigation and proceedings (without any basis) as to Plaintiff minors J.F. and R.F., and to cause said minors to be removed from the care, custody and control of their parent having sole legal and physical custody, Plaintiff Clare, and to become dependents of Defendant COUNTY, and

continue to be removed and a dependent of the county, and did so without proper reason or authority, without reasonable probable cause and with deliberate indifference to the rights of said Plaintiffs. *See, i.e., Mabe v. County of San Bernandino*, 237 F.3d 1011 (9th Cir. 2001); California Welf. and Inst. Code §§ 306, 309, 311, and 319.

135.   Further, the Individual Defendants, inclusive, and each of them, conspired to and did in fact, acting with malice, make false and misleading statements in an application and warrant for custody of Plaintiff minors J.F. and R.F., in order to deceive the court and to harm Plaintiffs, and each of them, by causing the court to order the continued removal of the minor Plaintiffs from the care, custody and control of Plaintiff Warren, depriving all Plaintiffs of their rights under the 4th and 14th Amendment to the United States Constitution.

136.   The aforesaid Defendants, inclusive and each of them, conspired to interfere with and violate the civil rights of the Plaintiffs, as set forth under 42 U.S.C. § 1983, including violation of the Plaintiffs' rights found in the Fourth and Fourteenth Amendments of the United States constitution, by, but not limited to, acting and conspiring to retaliate against Plaintiffs for exercise of their freedom to petition the court, and by causing to remove, detain, and continue to detain, the person and/or physical and legal custody of the Plaintiff minors, from the care, custody and control of the parent having sole physical and legal custody, Plaintiff Warren, without proper

or just cause and/or authority; by the use of intimidation, coercion and duress, and by using false and fabricated evidence and testimony, and failing to provide exculpatory evidence, during the investigation and initiation and pendency of the dependency proceedings, including the petition for continued detention of Plaintiff minors, in violation of, and interference to, the Plaintiffs' constitutional liberty interests under the First Amendment, their fundamental rights to familiar association and due process under the Fourteenth Amendment, and in violation of Fourth Amendment rights against unreasonable searches and seizures.

137.   As a direct result of these Individual Defendants' violations, and in accordance with 42 U.S.C. § 1983, Plaintiffs civil rights have been violated in that they have suffered, and will continue to suffer damages, including but not limited to, physical, emotional and mental anxiety and anguish; as well as to incur attorney fees, costs and expended in the underlying case and in this matter, as authorized by 4 U.S.C. § 1988 in an amount not yet ascertained, all of which will be shown according to proof at trial.

138.   Said Individual Defendants' wrongful conduct as alleged herein was intentional, done with malice, and with conscious disregard of the truth and for the rights of the Plaintiffs herein, and as a result of their despicable conduct, Plaintiffs are therefore entitled to recover punitive damages from said individual Defendants'

wrongful acts for the purposes of punishing said Defendants and to deter others from such conduct in the future.

**THIRD CAUSE OF ACTION**
**VIOLATION OF CIVIL RIGHTS - FOURTEENTH AMENDMENT**
**UNDER 42 U.S.C. §§ 1983**
**(Against All Individual Defendants)**

139.    Plaintiffs adopt and incorporate as if set forth at length herein, paragraphs 1 through 138.

140.    Commencing on or about May 31, 2025 and continuing through the date of filing this action, All Individual Defendants, and Does 1 through 50, Inclusive, and each of them, as alleged herein, were acting under color of state law when they knew and agreed, and thereby conspired, to unlawfully detain, seize, question, threaten, examine, coerce, and/or initiate and pursue an investigation and proceedings (without any basis) as to Plaintiff minors J.F. and R.F., and to cause said minors to be removed from the care, custody and control of their parent having sole legal and physical custody, Plaintiff Clare, and to become dependents of Defendant COUNTY, and continue to be removed and a dependent of the county, and did so without proper reason or authority, without reasonable probable cause and with deliberate indifference to the rights of said Plaintiffs. *See, i.e., Mabe v. County of San Bernandino*, 237 F.3d 1011 (9th Cir. 2001); California Welf. and Inst. Code §§ 306, 309, 311, and 319.

141.   Further, the Individual Defendants, inclusive, and each of them, conspired to and did in fact, acting with malice, make false and misleading statements in an application and warrant for custody of Plaintiff minors J.F. and R.F., in order to deceive the court and to harm Plaintiffs, and each of them, by causing the court to order the continued removal of the minor Plaintiffs from the care, custody and control of Plaintiff Warren, depriving all Plaintiffs of their rights under the 14th Amendment to the United States Constitution.

142.   The aforesaid Defendants, inclusive and each of them, conspired to interfere with and violate the civil rights of the Plaintiffs, as set forth under 42 U.S.C. § 1983, including violation of the Plaintiffs' rights found in the Fourth and Fourteenth Amendments of the United States constitution, by acting and conspiring to interfere in the fundamental liberty interest of Plaintiff Warren, the parent having sole legal and physical custody of the minor Plaintiffs, without proper or just cause and/or authority and without substantial due process; by the use of intimidation, coercion and duress, and by using false and fabricated evidence and testimony, by causing the children to wrongfully believe that it was not safe to be with their mother because of retaliatory false inferences made to the children by the Defendants, when Plaintiff Warren raised concerns to the Defendants about whether information was being relayed fully, and failing to provide exculpatory evidence, during the investigation and initiation and pendency of the dependency proceedings, including the petition for continued detention of Plaintiff minors, in violation of, and interference to, the

Plaintiffs' fundamental rights to familiar association and due process under the Fourteenth Amendment. *See Troxel v. Granville,* 530 U.S. 57 (2000).

143.   As a direct result of these Individual Defendants' violations, and in accordance with 42 U.S.C. § 1983, Plaintiffs civil rights have been violated in that they have suffered, and will continue to suffer damages, including but not limited to, physical, emotional and mental anxiety and anguish; as well as to incur attorney fees, costs and expended in the underlying case and in this matter, as authorized by 4 U.S.C. § 1988 in an amount not yet ascertained, all of which will be shown according to proof at trial.

144.   Said Individual Defendants' wrongful conduct as alleged herein was intentional, done with malice, and with conscious disregard of the truth and for the rights of the Plaintiffs herein, and as a result of their despicable conduct, Plaintiffs are therefore entitled to recover punitive damages from said individual Defendants' wrongful acts for the purposes of punishing said Defendants and to deter others from such conduct in the future.

## FOURTH CAUSE OF ACTION
## JUDICIAL DECEPTION
### (Against All Individual Defendants)

145.   Plaintiffs adopt and incorporate as if set forth at length herein, paragraphs 1 through 144.

146.   The right to familial association guaranteed under the Constitution's Fourteenth Amendment is so "clearly established" such that any reasonable HHSA worker and/or child abuse investigator, or other governmental agent, or person acting in an investigatory capacity - including these Defendants, and each of them, would know it is unlawful to continue to detain a child from the care, custody and control of its parents based on knowingly false information and/or to present a report to the dependency court based on information which the particular Defendant fraudulently or with malice obtained or caused to be obtained.

147.   Plaintiffs are informed and believe and thereon allege that the right of a parent to remain free of the government's fraudulent creation and/or presentation of false, misleading, and/or deceptive, and/or suppressed material exculpatory evidence in juvenile court proceedings is so clearly established that any government agent or person acting in an investigatory capacity faced with these Defendants' circumstances would know it is a violation of the Constitution of both the United States and California to either create, and/or present deceptive evidence against a parent in juvenile court proceedings. *Hardwick v. Cty of Orange,* 844. F.3d 1112, 1118-19 (9th Cir. 2017)("No official with an IQ greater than room temperature in Alaska could claim that he or she did not know that the conduct at the center of this case violated both state and federal law. The social workers in this case are alleged to have knowingly and maliciously violated the law in their attempt to sever [Plaintiff's] protected relationship with her [children]. Perjury is a crime under both federal and

California state law, as is the knowing submission of false evidence to a court. 18 U.S.C. 1621; Cal. Penal Code 118. Both crimes make no distinction between criminal and civil proceedings. This malicious criminal behavior is hardly conduct for which qualified immunity is either justified or appropriate."

148.   At all relevant times alleged herein, Defendants, Individually, and each of them, were acting under color of state law when they acted, agreed, and/or conspired to employ fraudulent tactics to remove and detain and continue to detain J.F. and R.F. from Plaintiffs' custody first by creating false evidence, and then later by presenting known materially false, incomplete, and misleading evidence to the Juvenile Court.

149.   The actions of these Defendants, and each of them, as alleged herein above were undertaken with a knowing and deliberate indifference to Plaintiffs' rights, and/or with the specific intention of harming them both personally and in their relationship with Plaintiff Warren's children, J.F. and R.F.

150.   These Defendants, and each of them, maliciously conspired to violate Plaintiffs' constitutional rights including their rights arising under the First and Fourteenth Amendments to the United States Constitution - and did violate their rights by, but not limited to: the creation and propagation of false information in Defendant Gutierrez's contact notes with the intention that said information be incorporated into later Court Reports by others; and then later, by the making of knowingly false reports of child abuse; the creation and propagation of false medical

records with invalid urine tests of the children; the intentional fabrication of inculpatory evidence by Individual Defendants, and DOES 1-50, inclusive - all knowing and intending that it would be presented to the Juvenile Court, accepted into evidence, and relied upon by the juvenile court in making its decisions.

151.   The aforementioned misrepresentations and omissions, and others, were material to the outcome of the Detention Hearing in that, as alleged herein above, the Juvenile Court accepted them into evidence and relied upon them in making each and every one of its findings and orders.

152.   The aforementioned misrepresentations and omissions, and others, were material to the outcome of the Detention Hearing in that, as alleged herein above, the Juvenile Court accepted them into evidence and relied upon them in making each and every one of its findings and orders.

153.   The aforementioned conduct by these Defendants, and each of them, was malicious, and had the effect of denying Plaintiff Warren her right to a fair hearing as well as her rights to continued custody of her children, J.F. and R.F. for an unnecessary and excessive period of time. By spreading lies, maliciously refusing to provide exculpatory evidence, and presenting fabricated evidence to the Juvenile Court, including comments improperly coerced from the children by improper interrogation tactics, during the pendency of the dependency proceedings these Defendants, and each of them, knowingly and intentionally violated Plaintiffs' rights

arising under the First and Fourteenth Amendments to the United States Constitution.

154.   As a direct and proximate result of these Defendants' actions Plaintiffs have suffered and will continue to suffer mental and emotional injury, economic injury, as well as physical manifestations of such mental and emotional suffering, all to an extent, degree, and amount subject to proof at trial.

155.   Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, acted with malice, oppression and fraud or otherwise acted with a willful, wanton, knowing and conscious disregard for Plaintiffs' rights and in a despicable, vile and contemptible manner. Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing these Defendants, and each of them, in order to deter them, and others similarly situated, from similar such misconduct in the future.

**FIFTH CAUSE OF ACTION**
**MONELL RELATED CLAIMS**
**Against the County, Polinsky, and H.H.S.A.**

156.   Plaintiffs reallege, adopt and incorporate as if set forth at length herein, paragraphs 1 through 155.

157.   At all relevant times herein, Defendants COUNTY and POLINSKY, including through its H.H.S.A. agency, established and/or followed policies, procedures, customs and/or practices (hereinafter collectively referred to as "policy" or

"policies") which policies were the cause of violation of Plaintiffs' constitutional rights granted to them pursuant to 42 U.S.C. § 1983, as well as the case of *Monell v. New York City Department of Social Services,* 436 U.S. 658 (1978), including those under the First, Fourth, and Fourteenth Amendments; including but not limited to:

a.    The policy of detained and/or removing children from their parents without exigent circumstances (imminent danger of serious bodily harm), court order or consent of their parent or legal guardian;

b.    The policy of using false and misleading information and failing to provide exculpatory information in the petition for removal to remove and detain children from the care and custody of their parents;

c.    The policy of detaining and/or removing children from their parents and failing to determine whether the scope of the intrusion was reasonably necessary to avert the specific injury;

d.    The policy of causing minor children to be dependents of the County, and continuing to be dependents, removing their legal and physical custody from their parents beyond a reasonable period after the alleged basis for any such removal and continued detention is negated;

e.    The policy of using intimidation, fear, threats, coercion, retaliation, misrepresentation and duress during their investigation of allegation of child abuse and/or neglect, and during the pendency of dependency proceedings;

COMPLAINT

f.      The policy of using trickery, duress, fabrication and/or false testimony or evidence, and in failing to provide exculpatory evidence, in preparing and presenting reports and court documents to the Court including petitions for detention of children away from the care, custody and control of their parents, causing an interference with the Plaintiffs' rights, including those to due process and familial relations, and injuring and harming them;

g.      The policy of signing and presenting petitions in dependency actions under the penalty of perjury without personal knowledge of the truth and/or accuracy of the allegations therein, and/or with reckless disregard thereof;

h.      The policy of causing intrusive medical examinations and/or procedures of a minor child without the knowledge, consent, presence and/or authorization of the parents or legal guardians, and without exigency (imminent danger of serious bodily harm), without medical need and without court order;

i.      The policy of failing to promptly provide exculpatory and/or relevant and related evidence, testimony, reports and information regarding the ongoing investigation of juvenile dependency matters, when such information would negate the basis for continued detention of the minor children;

j.      The policy of allowing its agents, officials and employees to violate Criminal Restraining Orders by allowing the putative father to know the location of the children, be involved in meetings regarding the Defendants' plans for the children with the exclusion of the parent having sole physical and legal custody; and have

regular visitation with the children in violation of and despite the restraining order

preventing such visitation;

k.      The policy of allowing the juvenile court not to record or prepare transcripts of

hearings in dependency hearings, despite a local rule of the Court of Appeals of

California, Fourth Appellate District requiring transcripts be provided starting with

the detention hearing, and California Rule of Court 5.532 requires a recording and/or

transcript of all proceedings before a judge;

l.      By acting with deliberate indifference in implementing a policy of inadequate

training, and/or by failing to train and supervise its officers, agents and employees, in

providing the Constitutional protections guaranteed to individuals, including those

under the First, Fourth and Fourteenth Amendments, and under California law, when

performing actions related to the investigation of child abuse and neglect, including

dependency type proceedings; and

m.      By acting with deliberate indifference in implementing a policy of failing to

train and supervise its officers, agents and employees, in proving for the care and

safety of children in their custody, including failing to protect the children from abuse

and harmful conduct by its officers, agents and employees, allowing violation of the

Constitutional protections guaranteed to individuals, including those under the Fourth

and Fourteenth Amendments, and under California law.

(The list is non-exhaustive due to the pending nature of discovery and the

privileged and protected records of investigative and juvenile records, which are

subject to access, use and/or disclosure pursuant to California Welf. & Inst. Code 827 and 828).

158. Defendants COUNTY, as well as POLINSKY and H.H.S.A., as an agency of the COUNTY, had a duty to Plaintiffs at all times to establish, implement and follow policies, procedures, customs and/or practices which confirm and provide for the protections guaranteed them under the United States Constitution, including the First, Fourth, and Fourteenth Amendments; to use reasonable care to select, supervise, train, control and review the activities of all agents, officers, and employees in their employ, including within H.H.S.A.; and further, to refrain from acting with deliberate indifference to the Constitutional rights of Plaintiffs herein so as not to cause them the injuries and damages alleged herein.

159. Defendant COUNTY breached its duties and obligations to Plaintiffs, including but not limited to, failing to establish, implement and follow the correct and proper Constitutional policies, procedures, customs and practices; by failing to properly select, supervise, train, control, and review their agents and employees as to their compliance with Constitutional safeguards; and by permitting named Defendants, and Does 1 through 50, Inclusive, to engage unimpeded in the unlawful and unconstitutional conduct as herein alleged.

160. Defendants knew, or should have known, that by breaching the aforesaid duties and obligations that it was foreseeable that they would, and did, cause Plaintiffs

to be injured and damaged by their wrongful policies and acts as alleged herein and that such breaches occurred in contravention of public policy and as to their legal duties and obligations to Plaintiffs. *See Swartwood v. County of San Diego,* 84 F.Supp.3d 1093 (S.D. Cal. 2014); *A.G. v. County of San Diego,* Case No. 3:16-cv-02290-AJB-KSC (S.D.Cal. 2016); *Dunn v. County of San Diego,* 13-cv-0209-JAH-KSC (S.D.Cal. 2013); *Greenspan v. County of San Diego,* Case No. 13-cv-00210-LAB-DHB (S.D. Cal. 2013); *Garcia v. County of San Diego,* Case No. 3:15-cv-00189-JLS-NLS (S.D. Cal. 2015); *Parkes v. County of San Diego,* 345 F.Supp.2d 1071 (S.D. Cal. 2004); *Mann v. County of San Diego,* 907 F.3d 1154 (9th Cir. 2018); *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000).

161.   Defendant COUNTY knew, or should have known, that by allowing the Individual Defendants, HHSA, and POLINSKY, and each of them, to conduct invasive medical examinations and/or procedures of a minor child without the knowledge, consent, presence and/or authorization of the parents or legal guardians, and without exigency (imminent danger of serious bodily harm), without medical need and without court order, that it was foreseeable that they would, and did, cause Plaintiffs to be injured and damaged by their wrongful policies and acts as alleged herein and that such breaches occurred in contravention of public policy and as to their legal duties and obligations to Plaintiffs.

162.  Even though Defendant COUNTY has been consistently sued for similar such conduct on multiple occasions, and has acknowledged that further and/or better training and supervision is needed, Defendant COUNTY has remained deliberately indifferent to this admitted need and has refrained from implementing a further, constitutionally adequate, program of training and supervision.

163.  By its action or inaction, Defendant COUNTY has ratified and/or approved of these Defendants' unwarranted seizure and continued unjustifiable detention of minor Plaintiffs J.F. and R.F. and intentional and malicious violation of the Constitutional rights of the Plaintiffs.

164.  These actions, or inactions, of Defendants are the legal cause of injuries to Plaintiffs as alleged herein; and as a result thereof, Plaintiffs have sustained general and special damages, as well as incurring attorneys fees, costs and expenses, including those authorized by 42 U.S.C. 1988, to an extent and in an amount subject to proof at trial.

**SIXTH CAUSE OF ACTION**
**Violation of State Civil Rights (Under Cal. Civ. Code 43)**
**As to All Defendants**

165.  Plaintiffs reallege, adopt and incorporate as if set forth herein, paragraphs 1 through 164.

166.  All Defendants, and Does 1 through 50, inclusive, are individuals who were acting under color of law in conducting an investigation and proceedings

pursuant to California and federal law, including as to proceedings described in California Government Code 820.21(a), and, including, but not limited to, the required compliance to California Welfare and Institutions Code Sections:

a.      290.1 (regarding the requirements when taking a child into custody and immediately filing a petition as to the requirements in *Mabe v. San Bernandino County, Dep't of Pub. Servs.*, 237 F.3d 1101, 1107 (9th Cir. 2001);

b.      300 (including regarding the disruption of or intrusion into family life);

c.      305 (regarding conditions allowing temporary custody without a warrant);

d.      306 (including regarding the conditions in which to take, and maintain custody of a minor without a warrant to remove);

e.      307 (including regarding required notice to parents and giving preference to alternatives which least interfere with parents custody of the minor);

f.      307.4 and 308 (regarding providing immediate notice to parents and other certain rights);

g.      309 (including regarding the conditions required to investigate the facts and circumstances of a minor taken into custody and when to release said minor to the custody of his parent or guardian, or to temporarily place the minors);

h.      311 (regarding the requirements of filing a petition pursuant to the requirements of section 332);

i.      319 (regarding the requirements of filing a court report regarding whether a minor has been removed and the need for continued detention);

j.      324.5 (regarding medical procedures of a child in protective custody), and including as required in *Wallis v. Spencer,* 202 F.3d 1126 (9th Cir. 2000) and *Mann v. Cty of San Diego*, 907 F.Supp.3d 1154 (9th Cir. 2018); and

k.      332 (regarding the filing and contents of a petition).

167.    To the extent not separately responsible, Defendant COUNTY is vicariously responsible for these Defendants' conduct under Government Code 815.2; and said conduct is not immunized, including by Government Code 820.21.

168.    As a result of the conduct of said Defendants, and each of them, as adopted and incorporated by paragraphs previously set forth herein, Defendants and each of them, violated Plaintiffs' personal and civil rights, including the right of protection from unwarranted and unlawful seizure, bodily restraint or harm, from personal and physical insult and violation, from defamation and from injury to personal relation, as set forth in California Civil Code 43, including by, but not limited to, interfering, by threat, intimidation, or coercion, or attempts thereto, in the exercise and enjoyment of Plaintiffs' rights secured by the United States Constitution, other federal laws, and the Constitution and laws of the State of California (conduct not immunized by California's Government Code 820.21 and federal law), under color of law and by the use of fabrication of evidence, failure to disclose exculpatory evidence, and by obtaining and/or attempting to obtain, evidence and testimony by duress, fraud and undue influence. (Pursuant to *Venegas v. County of Los Angeles,* 32

Cal.4th 820 (2004), Plaintiffs are not required to make a showing of discriminatory intent or show that they are members of a protected classification to exercise these rights).

169. The acts of Defendants as previously alleged in this Complaint, and incorporated by the references herein, interfered or attempted to interfere, with the exercise of Plaintiffs' personal and civil rights under the laws and Constitution of the State of California, including the Plaintiffs' rights of privacy and those rights under Civil Code 43, as well as the laws of the Constitution of the United States, as stated herein.

170. As a direct and proximate result of the aforementioned conduct of Defendants, and each of them, Plaintiffs have suffered and will continue to suffer damages, including but not limited to, great emotional and psychological distress, humiliation and mental anguish, the nature and amount of which will be shown according to proof at trial.

171. These violations of the Plaintiffs' personal and civil rights by Defendants, and Does 1 through 50, inclusive, and each of them, are protected and guaranteed by California Civil Code 52.1, entitling Plaintiffs to damages and relief, including damages under California Civil Code 52, other equitable relief, punitive damages, injunctive relief, statutory civil penalty (including $25,000 as to each individual Defendant) and attorneys' fees (pursuant to CC 52.1(h)), all of which are requested herein.

COMPLAINT

172. In doing the acts alleged in this Complaint, Defendants, and each of them, knew or should have known that their actions were likely to, or would, injure and damage Plaintiffs, and Plaintiffs are informed and believe, and thereon allege, that the Individual Defendants, and each of them, intended to cause injury and damage to Plaintiffs, and/or acted with malice and/or a willful and conscious disregard of Plaintiffs' rights, thus entitling Plaintiffs to recover punitive damages as against said individual Defendants.

**SEVENTH CAUSE OF ACTION**
**Violation of State Civil Rights (Under Cal. Civ. Code 52.1)**
**As to All Defendants**

173.    Plaintiffs reallege, adopt and incorporate as if set forth herein, paragraphs 1 through 172.

174. All individual Defendants, and Does 1 through 50, Inclusive, are individuals who were acting under color of law in conducting an investigation and proceedings pursuant to California law, including as to proceedings described in Government Code 820.21(a).

175. To the extent not separately responsible, Defendant COUNTY is vicariously responsible for these Defendants' conduct under Government Code 815.2; and said conduct is not immunized, including by Government Code 820.21.

176. As a result of the conduct of said Defendants, and Does 1 through 50, Inclusive, as adopted and incorporated by paragraphs previously set forth herein, Defendants and each of them, have violated Plaintiffs' rights by

interfering with Plaintiffs' rights by threats, intimidation, or coercion, or attempts thereto, including to force Plaintiffs to conform to their demands, and in retaliation of Plaintiffs' exercise of their rights, causing the violation and interference with the exercise or enjoyment of Plaintiffs' rights secured by the laws and Constitution of the United States, and the Constitution and laws of the State of California, including by using fabricated evidence, failure to disclose exculpatory evidence, and by obtaining and/or attempting to obtain, evidence and testimony by duress, fraud, and by obtaining and/or attempting to obtain, evidence and testimony by duress, fraud, and undue influence, in juvenile dependency investigations and proceedings.

177.  As a direct and proximate result of the aforementioned conduct of the Defendants, and each of them, Plaintiffs have suffered and will continue to suffer damages, including great emotional and psychological distress, humiliation, and mental anguish, the nature and amount of which will be shown according to proof at trial.

178.  These violations of the Plaintiffs' rights by Defendants, and Does 1 through 50, inclusive and each of them, are guaranteed and protected by Civil Code 52.1 entitling Plaintiffs to damages and relief, including compensatory and punitive damages, other equitable relief, injunctive relief, statutory civil penalty (including $25,000.00 as to each individual Defendant) and attorneys' fees, all of which are requested herein.

179. In doing the acts alleged in this Complaint, Defendants, and each of them, knew or should have known, that their actions were likely to, or would, injure and damage Plaintiffs, and Plaintiffs are informed and believe, and thereon allege, that the Individual Defendants, and each of them, intended to cause injury and damage to Plaintiffs, and/or acted with malice and/or a willful and conscious disregard of Plaintiffs' rights, thus entitling Plaintiffs to recover punitive damages as against said Individual Defendants.

**EIGHTH CAUSE OF ACTION**
**Violation of Federal Civil Rights - Monell Related Claims**
**As to Rady Children's Hospital**

180. Plaintiffs reallege, adopt and incorporate as if set forth herein, paragraphs 1 through 179.

181. Upon information and belief, Defendant Rady Children's Hospital operates and manages a Child Protection Team (CPT) which includes as its members law enforcement personnel, HHSA personnel and personnel from the prosecutory teams of the COUNTY

182. Defendant Rady, and its Child Protection Team, routinely collaborate and partner with HHSA, law enforcement and the courts. Specifically, Defendant Rady and its members initiate and authorize medical exams, along with other investigatory functions. With respect to the medical examinations, the following types of exams are regularly performed by RADY personnel at its facilities as part of its investigatory function at the behest of HHSA: 1) sexual

abuse examinations; 2) acute sexual assault examinations with evidence collection; 3) physical abuse examinations; 4) exams of neglect, malnutrition and other concerns; and 5) other forensic medical examinations including drug testing.

183.   On further information and belief, all or most of these medical examinations are undertaken without first obtaining court approval or authorization.

184.   In short, Defendant RADY is regularly engaged by the COUNTY for its investigatory and "expert" services, and regularly cooperates in joint action with HHSA to investigate allegations of child abuse - which is categorically a traditional governmental function.

185.   On information and belief, pursuant to the terms of a contract or other similar such agreement with the County, RADY and its Child Protection Team regularly and systemically performed and continues to perform non-consensual and unwarranted investigatory medical services in collaboration with HHSA, at the behest of, and direction of, HHSA and its protective service workers.

186.   Defendant Nienow was, and is, an officer, agent and/or employee of RADY working primarily in an investigatory capacity on behalf of RADY pursuant to its agreement with the COUNTY.

187.   Specifically with respect to their interactions with Plaintiffs and the County and Individual Defendants, on information and belief, Defendants Nienow and Individual Doe Defendants, acted in an investigatory capacity as members of

the Child Protection Team investigating allegations of abuse of J.F. and R.F. by their mother. They did not undertake any efforts to diagnose, treat, or heal J.F. and R.F., and did not review anything about the minor children Plaintiffs until after they had already been discharged from RADY.

188. At all times mentioned herein, Defendants Nienow, and Individual Doe Defendants, were acting in in the course and scope of their duties as employees and/or agents of RADY, and in accordance and conformance with the regularly established customs and practices of both RADY and the COUNTY.

189. At all times relevant herein, Defendants Niewnow, and the Individual Doe Defendants, were acting under color of law in that they were performing an investigative function, at the behest of and in joint collaboration with the COUNTY, to uncover and create evidence of child abuse as opposed to a medical function designed to treat or heal J.F. and R.F., who presented with no medical issues.

190. At all times, RADY did not not, and does not currently, have an official policy requiring its staff or Child Protection Team members to refrain from acts of judicial deception as fully articulated in the body of this Complaint, above.

191. On information and belief, at all times relevant herein, Defendant RADY knew or should have known, of the need to establish such customs, policies, practices and training as are required to protect the aforementioned constitutional rights of children and parents with whom Defendant RADY and its agents and/or

employees regularly come into contact, but are (and have been) deliberately indifferent to that need.

192.  At the time of the underlying events alleged herein, the regularly established policies, customs, and/or practices of RADY, that were followed, adhered to, complied with, and carried out by their employees and/or agents - particularly Defendant Nienow, were the moving force that causes the violation of Plaintiffs' constitutional rights as alleged herein above, including but not limited to:

a.    The custom and/or practice of subjecting children to unwarranted non-consensual medical examinations and/or procedures including but not limited to diagnostic procedures and tests (such as drug urine tests);

b.    The policy of conducting medical procedures, including examinations, on children removed from their parents without exigent circumstances, court order or warrant, or parental consent, in violation of the Constitutional rights of their parents, as discussed in *Wallis v. Spencer,* 202 F.3d 1126 (9th Cir 2000) and as confirmed in *Mann v. County of San Diego,* 907 F.3d 1154 (9th Cir. 2018);

c.    The custom and/or practice of barring a parent from being in close proximity to their child during medical care, diagnosis, and/or treatment without first obtaining court orders permitting such exclusion;

d.    The custom and/or practice of barring a parent from obtaining full and complete medical records of their children for examinations done at the Defendants' facilities;

e.    The custom and/or practice of subjecting children to unwarranted non-consensual medical tests and procedures; and

f.    The custom, policy, and/or practice of acting with deliberate indifference to the need to be truthful, honest, accurate and complete in creating reports and other documents that would be reasonably and normally expected to be submitted to the juvenile court and relied on as evidence;

g.    The custom, policy, and/or practice of acting with deliberate indifference to the rights of children and parents with whom Rady and its Child Protection Team can regularly be expected to come into contact with by failing and/or refusing to implement a practice of regular and adequate training andor supervision, and/or by failing to train and/or supervise their respective officers, agents and employees to ensure compliance with the strictures of the Constitution's First, Fourth, and Fourteenth Amendments when performing actions related to child abuse investigations.

193.    When Defendant Nienow and the Individual Doe Defendants engaged in the conduct described and alleged herein above, they were acting pursuant to and

in accordance with Defendant RADY's regularly and well-established customs and practices and standard operating procedures.

194. On information and belief, Defendant RADY has never investigated Defendant Nienow and the Individual Doe Defendants for engaging in the conduct herein alleged, despite numerous lawsuits alleging the same.

195. On information and belief, as a matter of custom, practice and routine, Defendant RADY does not discipline or investigate its agents and/or employees for constitutional violations of the sort alleged herein, and in fact turns a blind eye to them.

196. Defendant RADY's custom, practices, policies, training, and/or failure to train its employees and/or agents on these established constitutional rights was a substantial factor in causing the violation of Plaintiffs' constitutional rights and in causing Plaintiffs harm.

197. Even though Defendant RADY has been consistently sued for similar such conduct on multiple occasions, and has acknowledged that further and/or better training and supervision is needed, Defendant RADY has remained deliberately indifferent to this admitted need and has refrained from implementing a further, constitutionally adequate, program of training and supervision.

198. By its action or inaction, DefendantRADY has ratified and/or approved of these Defendants' unwarranted medical examinations and fabrication of evidence resulting in the intentional and malicious violation of the Constitutional rights of the Plaintiffs.

199. These actions, or inactions, of Defendant RADY are the legal cause of injuries to Plaintiffs as alleged herein; and as a result thereof, Plaintiffs have sustained general and special damages, as well as incurring attorneys fees, costs and expenses, including those authorized by 42 U.S.C. 1988, to an extent and in an amount subject to proof at trial.

**NINTH CAUSE OF ACTION**
**Violation of Federal Civil Rights by Fabrication of Evidence - Pursuant to 42 U.S.C. 1983**
**As to Defendant Nienow and DOES 1-50**

200. Plaintiffs reallege, adopt and incorporate as if set forth herein, paragraphs 1 through 199.

201. The above referenced constitutional mandates apply equally to government and to those private persons who are willful or voluntary participants with the government in providing childcare and social services.

202. Defendant Nienow, and the Individual Doe Defendants, and each of them, were at all relevant times an agent, officer and/or employee of RADY primarily

COMPLAINT

functioning in an investigatory capacity on behalf of RADY pursuant to its agreement with the COUNTY.

203.    At all relevant times alleged herein, Defendant Nienow and the Individual Doe Defendants,  and each of them, were acting under color of state law when they acted, agreed, and/or conspired to provide opinions to the COUNTY, knowing they will be used to justify the detention and/or continued detention of minor child Plaintiffs J.F. and R.F., despite knowledge of said reports being based on speculation, insufficient information and faulty methodology.

204.    At all relevant times alleged herein, Defendant Nienow and the Individual Doe Defendants,  and each of them, were acting under color of state law when they acted, agreed, and/or conspired to include false, inaccurate, misleading and/or untrue factual statements in the documents and reports relating to minor child Plaintiffs J.F. and R.F. with the knowledge and expectation that they will be provided to the juvenile court in support of HHSA action, including providing a drug test with sample numbers that did not match the collection records and which were not tested until several days after they had been collected, with no chain of custody provided;

205.    At all relevant times alleged herein, Defendant Nienow and the Individual Doe Defendants,  and each of them, were acting under color of state law when they acted, agreed, and/or conspired to suppress and/or omit known exculpatory

evidence from documents and reports relating to minor child Plaintiffs J.F. and R.F. with the knowledge and expectation that they will be provided to the juvenile court in support of HHSA action, including excluding information about a negative drug test for Plaintiff J.F.

206.    The creation and presentation of false, fabricated, incomplete, and fraudulently misleading evidence was not an isolated incident specific to Plaintiffs' circumstances or the circumstances of this particular case. Instead, on information and belief, Defendant Nienow and the Individual Doe Defendants, and each of them, regularly fabricate evidence, include false statements, and/or suppress known exculpatory evidence, in documents and reports and/or other documents they provide to HHSA agents with the knowledge that the same will be provided to the juvenile court and relied upon.

207.    Defendant Nienow and the Individual Doe Defendants, and each of them, acted intentionally and maliciously, with a knowing disregard for Plaintiffs' constitutional rights.

208.    The Defendants knew or should have known that by breaching the above-mentioned duties and obligations that it was reasonably foreseeable that their actions would and did directly cause the Plaintiffs to be injured and damaged as alleged herein.

COMPLAINT

209.  As a result of the Defendants' actions, the Plaintiffs have sustained general and special damages, to an extent and in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request and pray judgment against the Defendants as follows:

1.  Declare that the Defendants, jointly and severally, have engaged in policy and practices which significantly impact and deny parental and minor Constitutional rights under the U.S. Constitution and California Constitution;

2.  Declare that the Defendants, jointly and severally, have wrongfully violated the Fourth Amendment rights of the Plaintiffs by detaining Plaintiffs J.F. and R.F. without a full hearing, without court issued warrant, and by subjecting Plaintiffs J.F. and R.F. to invasive medical examinations without a medical emergency and without the consent of Plaintiff Warren, the parent having sole physical and legal custody of the children, and without observing the requirements of Cal. Welf. & Inst. Code 300 et seq.;

3.  Declare that the Defendants, jointly and severally, have wrongfully violated the First Amendment rights of Plaintiff Warren by acting in retaliation and with malice against Plaintiff Warren for exercising her rights to petition the court for habeas protection of the children;

COMPLAINT

4.  Declare that the Defendants, jointly and severally, have wrongfully violated the Fifth Amendment rights of the Plaintiffs by preparing and presenting falsified evidence to the court and by failing to provide counsel for the minors in dependency proceedings with exculpatory evidence, other evidence, and access to services and information necessary to ensure proper placement of the minor children;

5.  Enjoin the Defendants from continuing to follow and promulgate policies and practices which deprive parents and minor children of their rights under the U.S. Constitution and California Constitution;

6.  Mandate that the Polinsky Children's Center be placed under federal oversight to ensure compliance with Constitutional requirements;

7.  Mandate that the COUNTY immediately conduct investigation into the conduct of Defendant Christina MORSE and Ashley GUTIERREZ;

8.  Mandate that Defendant RADY no longer allows Defendant NIENOW to conduct medical investigations of children;

9.  Mandate that COUNTY and Defendant RADY establish and enforce policies that prevent fabrication of evidence; and enforce existing policies to prevent Constitutional violations;

10. Mandate that Detention Reports provided by the Defendants can no longer be hearsay, and must be accompanied by a transcript and recording of the conversation;

11. Mandate that Minor's Counsel has access to all criminal records and investigative records that the government has;

12. General damages in an amount to be determined by proof at trial;

13. Medical and related expenses in an amount to be determined by proof at trial;

14. Punitive Damages as against individual defendants as permitted under 42 U.S.C. 1988 and Cal. Civ. Code 52.1;

15. Attorney fees, costs and expenses as authorized by 42 U.S.C. 1988, according to proof, as to First, Second, and Third Causes of Action;

16. Interest according to law;

17. Costs of this action;

18. Any injunctive and other and further relief that the Court considers proper.

Dated: July 23, 2025                                   Respectfully Submitted,

                                                    _s/Julie A. Goldberg_
                                                    Julie A. Goldberg
                                                    Goldberg & Associates
                                                    Attorney for Plaintiffs